Dean R. HAGEN and Nancy K.
Hagen, d/b/a Grand Avenue
Texaco, Plaintiffs,

The Iowa Comprehensive Petroleum
Underground Storage Tank
Fund Board, Appellant,

v.

TEXACO REFINING AND MARKETING,
INC., Seneca Corporation, and J & R
Drilling Services, Inc., Appellees.

No. 93–1794.

Supreme Court of Iowa.

Jan. 18, 1995.

Paul E. Horvath of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee Texaco Refining and Marketing, Inc.

Margaret C. Callahan, Charles F. Becker, and Roger T. Stetson of Belin Harris Lamson McCormick, P.C., Des Moines, for appellee Seneca Corp.

Philip H. Dorff, Jr. and Anne L. Clark of Hopkins & Huebner, P.C., Des Moines, for appellee J & R Drilling Services, Inc.

Considered by HARRIS, P.J., and CARTER, NEUMAN, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

This case requires that we consider the scope and meaning of the cost recovery enforcement provisions of Iowa Code chapter 455G (1993).[1] We granted permission to the Intervener, The Iowa Comprehensive Petroleum Underground Tank Fund Board, to bring this interlocutory appeal from the district court's ruling on the Board's motion for partial summary judgment. The district court held (1) factual issues existed which were material to whether defendants, Texaco Refining and Marketing, Inc., Seneca Corporation, and J & R Drilling Services, Inc., were liable for the release of petroleum from an underground storage tank, and (2) the owners of the underground storage tank could be assigned a percentage of fault in this cost recovery action. We affirm the district court's denial of partial summary judgment as to Texaco and reverse the district court's ruling on the other issues.

I. *Background Facts.*

In the fall of 1985, plaintiffs, Dean R. Hagen and Nancy K. Hagen, purchased a retail service station from Texaco. The purchase agreement required Texaco to install monitoring wells on the property. Texaco contracted with Seneca to install these monitoring wells. Seneca then subcontracted with J & R to drill the wells. Seneca was responsible for locating the exact place where J & R would drill.

Bonnie J. Campbell, Atty. Gen., and Dean A. Lerner, Asst. Atty. Gen., for appellant.

---

1. This case is governed by Iowa Code chapter 455G (1991), as amended by the legislature during the 1992 legislative session. The statute as it appears in the 1993 code is in fact the 1991 statute, as amended in 1992. For simplification in citation form, we will cite to the 1993 Code.

The record shows that one Friday in the fall of 1985, a Seneca employee went to the Hagens' service station and placed "manways," (twelve-inch-diameter metal rings), on the ground where the wells were to be drilled. Three days later, on Monday, the cement contractor, Nelson Construction, poured cement at the station, encasing the manways in concrete. About one month later J & R drilled the monitoring wells at the locations designated by the manways.

Seneca did not check the location of the manways on Monday to be sure they had not been moved over the weekend nor did it have anyone present when the concrete was poured. Although the monitoring wells were not drilled until a month later, Seneca did not check the placement of the manways before J & R drilled.

It is undisputed that J & R pierced an underground storage tank when it drilled one of the monitoring wells. Unfortunately, the Hagens did not discover the hole in the tank for three weeks. During these three weeks, the Hagens filled the tank several times. It is estimated that 2300 gallons of petroleum escaped from the tank through the hole.

## II. *Procedural History.*

In August of 1990, the Hagens applied for remedial benefits under Iowa's underground storage tank financial assistance program. *See* Iowa Code § 455G.9 (1993). The Board allowed the claim and expended money for corrective action taken at the site. The Hagens incurred expenses not covered by the program by virtue of the minimum copayments required of owners under chapter 455G. *See id.* § 455G.9(4).

The Hagens sued Texaco, Seneca and J & R alleging the defendants were negligent and seeking damages for the contamination and cleanup of the Hagens' property. Each defendant cross-claimed against the other defendants for contribution or indemnity. In addition, Seneca alleged that the Hagens were contributorily negligent.

The district court allowed the Board to intervene. The Board sought to recover from the defendants the moneys it had spent on corrective action. *See id.* § 455G.13.

After pursuing discovery, the Board filed a motion for partial summary judgment. It claimed that the undisputed facts showed that all defendants were strictly liable as a matter of law for the release of petroleum from the tank. *See id.* § 455G.13(7) (the standard of liability under section 455G.13 is strict liability). During the process of briefing, the parties also argued whether the Hagens could be assigned a percentage of fault to reduce the Board's recovery from the defendants. The trial court apparently treated this issue as a request for adjudication of law points. *See* Iowa Rule of Civil Procedure 105.

In the order from which the Board appeals, the district court denied the Board's motion for partial summary judgment and ruled that a factual dispute existed as to whether the defendants were liable for the release. The court also held that the Comparative Fault Act applied, *see* Iowa Code chapter 668, and therefore, any recovery by the Board would be reduced by any percentage of fault assigned to the Hagens. We granted the Board's application for interlocutory appeal.

## III. *Scope of Review.*

■■■ Our review of a district court's decision on summary judgment is for correction of errors at law. *Montgomery Ward Dev. Corp. v. Cedar Rapids Board of Review,* 488 N.W.2d 436, 439 (Iowa 1992). We determine whether a genuine issue of material fact existed and whether the district court correctly applied the law. *Farm & City Ins. Co. v. Anderson,* 509 N.W.2d 487, 489 (Iowa 1993). We view the whole record in a light most favorable to the party opposing the motion. *Id.*

■■■ Our review of the court's ruling on the legal issue raised in the pleadings concerning the apportionment of fault pursuant to chapter 668 is also for correction of errors of law. *Rasmussen v. Nebraska Nat'l Life Ins. Co.,* 170 N.W.2d 370, 372 (Iowa 1969) (review of ruling on rule 105 motion is on assigned error). If any facts essential to the disposition of the legal issue are disputed, we will remand the case to the trial court to determine the issue on the facts proven at

trial. *Andersen Constr. Co. v. National Bank,* 262 N.W.2d 563, 566 (Iowa 1978).

### IV. *Statutory Framework.*

In 1989 the Iowa legislature enacted a comprehensive law relating to petroleum underground storage tanks. 1989 Iowa Acts ch. 131. The act established the Iowa Comprehensive Petroleum Underground Storage Tank Fund which is administered by the Intervener Board. Iowa Code §§ 455G.3–.4 (1993). Revenue for the fund includes bonds issued by the Board, various taxes and fees, insurance premiums and recoveries from persons liable for petroleum releases. *Id.* § 455G.8.

Moneys in the fund are used in part for a "remedial program." *Id.* § 455G.9. This program provides assistance to eligible owners and operators of underground storage tanks for corrective action to clean up existing petroleum contamination.[2] *Id.* The release involved here qualified for the fund's remedial program. *See id.* § 455G.9(1)(a)(2) ("a release reported to the department of natural resources after May 5, 1989, and on or before October 26, 1990" qualifies for remedial benefits).

Although moneys for the cleanup were available from the fund, a minimum copayment schedule applied to the Hagens as the owners of the tank. *Id.* § 455G.9(4)(a). They were required to pay eighteen percent of the first $80,000 for the cost of corrective action and thirty-five percent of the cost above that figure. *Id.* The fund was obligated to pay the balance of the costs of corrective action up to one million dollars. *Id.* § 455G.9(1)(a)(2), (4)(b).

Chapter 455G contains detailed provisions for the fund's recovery of moneys spent on corrective action. *See id.* § 455G.13. In general, these provisions require the Board to recover the cost of corrective action from an owner, an operator or any other potentially responsible party. *Id.* § 455G.13(1). In addition, the Board may recover reasonable attorney fees and costs of litigation. *Id.*

However, if the owner or operator is eligible for assistance under the remedial program, the Board may not recover its expenses from the owner or operator except any unpaid copayment. *Id.* § 455G.13(2)(a).

The statute defines a "potentially responsible party" as "a person who may be responsible or liable for a release for which the fund has made payments for corrective action or third-party liability." *Id.* § 455G.2(15). The statute specifically provides that the "standard of liability for a release of petroleum . . . is strict liability." *Id.* § 455G.13(7).

The interpretation of these cost recovery provisions is the heart of this case. Therefore, we will discuss section 455G.13 in greater depth when we address the legal issues presented in this case.

### V. *Positions of the Parties With Respect to Defendants' Liability.*

The Board sought partial summary judgment on the basis that the defendants were strictly liable as a matter of law because they were potentially responsible parties "liable for the release" under section 455G.13. The defendants acknowledge that their conduct is judged under strict liability standards, but claim that summary judgment is inappropriate.

Texaco claims that it cannot be a potentially responsible party because it exercised no control over the installation of the monitoring wells. Seneca argues that when the record is viewed most favorably to the parties against whom summary judgment is sought, one can only conclude that Seneca's involvement in the release was limited to two actions. First, Seneca hired J & R to drill the wells. Second, Seneca identified the spot, albeit not the spot used, for the drilling. Seneca contends this conduct does not provide an adequate basis for a finding of causation.

Finally, J & R claims that factual disputes prevent the court from ruling as a matter of law that it is liable for the release. J & R

---

2. "Corrective action" includes any action taken to minimize, eliminate or clean up a release of petroleum. Iowa Code § 455G.2(6) (1993). It does not include "third-party liability"—property damage or bodily injury sustained by third par-

ties. *Id.* § 455G.2(6), (20). "Owner or operator" means the owner or operator of the tank at the time a covered release is reported or the application for fund benefits is submitted. *Id.* § 455G.9(9).

asserts that these factual disputes control whether its conduct was a proximate cause of the release. The factual disputes upon which J & R relies include (1) whether the Hagens refilled the tank when they knew or should have known that the tank had been pierced, and (2) who placed the manway in the location where the well was drilled. J & R argues that either the action of the Hagens or of the person placing the manway is the sole proximate cause of the release.

## VI. Standard of Liability.

■ As we previously noted, the statute defines a "potentially responsible party" as "a person who may be responsible or liable for a release."[3] Iowa Code § 455G.2(15) (1993).[4] The standard of liability is strict liability. Id. § 455G.13(7). Thus, this case requires us to decide whether any of the defendants are strictly liable for the release of petroleum from the Hagens' tank as a matter of law. That, in turn, requires us to determine what the legislature meant by the term "strict liability."

■ The statute does not define the term "strict liability" nor does it set out the elements the Board must prove to recover under this standard from potentially responsible parties. Therefore, we must resort to principles of statutory construction. One relevant principle of statutory construction is that the legislature is presumed to know the meaning given to a particular term by the courts unless the context shows otherwise.

*State v. Jones*, 298 N.W.2d 296, 298 (Iowa 1980). Therefore, we will examine how we have defined this term in our case law.

A. *Liability without fault.* Our court has used the term "strict liability" in different ways. We have frequently used this term to refer to liability imposed by statute. *E.g., Gail v. Clark*, 410 N.W.2d 662, 667 (Iowa 1987) (interpreting Iowa Code section 123.92 (1985)—the dram shop statute)[5]; *Wenndt v. Latare*, 200 N.W.2d 862, 869 (Iowa 1972) (interpreting Iowa Code section 188.3 (1971)—the animal trespass statute). In *Wenndt*, we characterized the strict liability of section 188.3 as lying "in principle between liability based on negligence and absolute liability." *Wenndt*, 200 N.W.2d at 869. We noted that it applies in the absence of fault but is not absolute liability because the statute provides for a defense. *Id.; see* Iowa Code § 188.3 (1971) (now codified at Iowa Code § 169B.3 (1993)) (no liability where the trespassing animal escapes through a partition fence negligently maintained by the adjoining landowner).

Similarly, "strict liability" has been used to refer to the liability imposed by statute upon the owner of a dog for injuries "done by" the dog. *Collins v. Kenealy*, 492 N.W.2d 679, 682 (Iowa 1992) (interpreting Iowa Code § 351.28 (1989)). Although section 351.28 provides for a defense to the strict liability imposed by that statute, we have characterized this liability as "absolute." *Id.*

---

3. Although the statute refers to a "potentially" responsible party who "may be ... liable," basic notions of fairness require that we interpret the statute to allow recovery from such a party only when the Board has established that the party *is liable* under the standard set forth in this opinion.

4. The Board relies on an expanded definition of the term "responsible party" adopted by Iowa's Environmental Protection Commission. The Commission's rule includes within the term "responsible party"

> the person causing, allowing or otherwise participating in the activities or events which cause the contamination, persons who have failed to conduct their activities so as to prevent the release of contaminants into groundwater, property owners who are obligated to abate a condition, or persons responsible for or successors to such persons.

567 Iowa Admin.Code r. 133.2 (1989). We do not consider this rule in deciding this case.

First, it was adopted prior to the enactment of chapter 455G and nothing in the Commission's rules purports to make it applicable to chapter 455G. *See id.* ch. 133 (Chapter 133 "is intended to implement Iowa Code section 455E.5(5) and Iowa Code chapter 455B, Division III, Part I and Division IV, Part 4.") Second, to the extent that this rule makes mere participation a basis for liability, the rule improperly expands the statutory definition of "potentially responsible party." *See First Iowa State Bank v. Iowa Dep't of Natural Resources*, 502 N.W.2d 164, 168 (Iowa 1993) (administrative rules must be consistent with legislative enactment).

5. A 1986 amendment to the dram shop statute abolished the strict liability nature of that statute. *Hobbiebrunken v. G & S Enterprises, Inc.*, 470 N.W.2d 19, 21 (Iowa 1991).

We have also used the term "strict liability" as a label for some common-law tort theories. One such common-law tort theory is that of products liability based on the sale of an unreasonably dangerous product in the absence of negligence. *E.g., Bingham v. Marshall & Huschart Mach. Co.*, 485 N.W.2d 78, 79 (Iowa 1992); *Hawkeye–Security Ins. Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970). Although not a theory of liability without fault, we usually call this cause of action strict liability.

The other common-law tort theory to which we apply this label is the liability standard adopted in abnormally dangerous activities cases. *E.g., National Steel Serv. Ctr., Inc. v. Gibbons*, 319 N.W.2d 269, 270 (Iowa 1982); *see* Restatement (Second) of Torts § 519 (1977) (applying strict liability to one involved in abnormally dangerous activities) [hereinafter "Restatement"]. *But see Davis v. L & W Constr. Co.*, 176 N.W.2d 223, 224–25 (Iowa 1970) (liability for ultrahazardous activity is more appropriately termed "liability without fault" rather than "strict liability").

■ Although we have given the term "strict liability" a variety of meanings depending upon the context in which it is used, we have consistently defined it as liability without fault when referring to statutory causes of action. We assume the legislature was aware of this meaning when it used this term in section 455G.13. Therefore, we conclude that the term "strict liability" in section 455G.13 must refer to liability without fault. Used in this fashion, strict liability means liability that exists even in the absence of negligence or intent to harm.

B. *Proximate cause.* Although we have concluded that the strict liability standard eliminates questions of negligence or intent to harm, we must still identify exactly what the Board must prove to establish that a potentially responsible party is in fact liable. In common-law strict liability cases, we have consistently required that the defendant's actions be a proximate cause of the plaintiff's damages. *E.g., National Steel Serv. Ctr., Inc.*, 319 N.W.2d at 270 (person who engages in ultrahazardous activity is liable for the consequences proximately resulting from the

activity); *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 15 (Iowa 1977) (ordinary tort rules of causation apply in strict products liability cases).

Both the animal trespass statute and the dog bite statute make the owner liable only for damages "done by" the animal. Iowa Code §§ 169B.3, 351.28 (1993). This language implicitly requires a causal connection between the animal's actions and the damages sought by the plaintiff. *See Beckler v. Merringer*, 131 Iowa 614, 616–17, 109 N.W. 185, 185–86 (1906) (suggesting a proximate cause requirement under the predecessor to Iowa Code section 351.28).

Even the strict-liability dram shop statute included a proximate cause element. A licensee could avoid liability upon proof that the intoxication "did not contribute" to the injurious actions of the intoxicated person. Iowa Code § 123.92 (1985).

■ We presume the legislature understood when it used the term "strict liability" that we have traditionally included a causation component in this theory of liability. Therefore, we conclude that in order for the Board to establish the responsibility or liability of a potentially responsible party, the Board must prove that the actions of that party were a proximate cause of the release of petroleum for which the Board expended cleanup funds.

■ Proximate cause includes both cause in fact and legal causation. *State v. Marti*, 290 N.W.2d 570, 584–85 (Iowa 1980). Cause in fact requires that a particular action in fact cause certain consequences to occur. *Schreckengast v. Hammermills, Inc.*, 369 N.W.2d 809, 810 n. 3 (Iowa 1985). This requirement is met upon proof that a defendant's conduct was a substantial factor in producing the damages and the damages would not have occurred except for the defendant's conduct. *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 323 (Iowa 1992).

"Legal causation presents a question of whether the policy of the law will extend responsibility to those consequences which have in fact been produced." *Dunlavey v. Economy Fire & Casualty Co.*, 526 N.W.2d

845, 853 (Iowa 1995). Because legal causation is based on policy, a nebulous and undefined concept, we use criteria adapted to particular problem areas to evaluate this aspect of causation. *Marti,* 290 N.W.2d at 585. One set of criteria relevant to this case is that for intervening, superseding cause.

We have held that a defendant's conduct is not a legal cause of a plaintiff's harm if it is superseded by later independent forces or conduct. *Smith v. Shaffer,* 395 N.W.2d 853, 857 (Iowa 1986); *Marti,* 290 N.W.2d at 586. The court must find that "the later-occurring event is such as to break the chain of causal events between the actor's [conduct] and the plaintiff's injury." *Kelly v. Sinclair Oil Corp.,* 476 N.W.2d 341, 349 (Iowa 1991).

■■■ Although the standard for legal causation is a question of law, *Dunlavey,* 526 N.W.2d at 853, proximate cause is a question of fact for the jury. *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854, 858 (Iowa 1994) (proximate cause is ordinarily a question for the jury); *Haumersen,* 257 N.W.2d at 15 (whether conduct was an intervening, superseding cause is for the jury unless undisputed facts leave no room for a reasonable difference of opinion). Consequently, in our review of the court's denial of the Board's motion for partial summary judgment, we must decide whether the undisputed material facts show that the actions of the defendants were a proximate cause of the release of petroleum from the Hagens' underground storage tank as a matter of law.

## VII. *Liability of Defendants.*

In considering whether the Board is entitled to summary judgment on the issue of the defendants' liability, we view the record in the light most favorable to the parties opposing the motion for summary judgment. *Farm & City Ins. Co.,* 509 N.W.2d at 489. Summary judgment is proper only if there is no genuine issue of material fact and the defendants are liable as a matter of law. *Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.,* 507 N.W.2d 405, 408 (Iowa 1993). A fact is "material" only if a resolution of the factual dispute would affect the outcome of the lawsuit. *Farm & City Ins. Co.,* 509 N.W.2d at 491.

We review the conduct of each defendant. Texaco was not actively involved in the installation of the monitoring wells. It simply contracted with Seneca to install the wells and retained no control over the installation. Seneca subcontracted with J & R to drill the wells, reserving for itself the responsibility of identifying for J & R the proper location for the wells. J & R drilled the monitoring wells where the manways were located at the time of the drilling. One of these manways was over an underground tank. J & R punctured the tank and petroleum escaped from the tank through the hole put in the tank by J & R.

There are also factual disputes. The parties disagree on whether someone moved the manway after its initial placement by Seneca and before J & R drilled the well. There is also a dispute concerning whether the Hagens filled the tank when they should have known the tank was leaking. In this regard there is some conflict about whether petroleum was released immediately upon the tank being punctured or only upon the tank being filled by the Hagens. Because we view the record in the light most favorable to the defendants, we assume for purposes of our analysis that someone moved the manway after it was correctly placed by Seneca, that the Hagens were negligent in putting petroleum in the tank after the monitoring wells had been drilled, and that no petroleum escaped from the tank until the Hagens filled it after the drilling.

A. *Texaco.* We first note that the Board does not rely on Texaco's own actions to impose liability on Texaco. Therefore, we do not address whether Texaco is liable under circumstances where it did not do any of the work itself but merely employed an independent contractor.

The Board's argument is that Texaco is vicariously liable for the conduct of its independent contractor, Seneca. *See* Restatement § 427A (one who employs an independent contractor to do work involving an abnormally dangerous activity is liable to the same extent as the contractor for physical harm to others). The Board claims that digging a monitoring well near an under-

ground storage tank is an abnormally dangerous activity.

None of the parties challenges the applicability of traditional rules of vicarious liability in a liability-without-fault context. Therefore, we assume for purposes of our discussion that these rules can be applied. However, we disagree with the Board that drilling a monitoring well at a retail service station is an abnormally dangerous activity.

 Factors to be considered in deciding whether an activity is abnormally dangerous include the existence of a high risk of harm, the likelihood that such harm will be great, an inability to eliminate the risks of the activity by the exercise of reasonable care, the extent to which the activity is uncommon, whether the activity is inappropriate in the place where it is conducted, and the extent to which the activity's value to the community outweighs its dangerous attributes. *Maguire v. Pabst Brewing Co.*, 387 N.W.2d 565, 568 (Iowa 1986) (citing Restatement § 520). We observed in *Maguire* that the legal principles imposing liability for abnormally dangerous activities are "aimed at risks which are not eliminated by the exercise of all reasonable precautions." *Id.* at 569. We concluded that the claim stated in that case did not provide a basis for the recovery of damages as a matter of law. *Id.* The rationale for this decision was our implicit conclusion that the activity upon which the plaintiff's claim was based, the distribution of beer, did not carry a high degree of risk that could not be eliminated with due care. *Id.*

 We reach a similar conclusion here. Monitoring wells can be installed safely if reasonable care is taken. Moreover, drilling monitoring wells is not an unusual activity around underground storage tanks and, therefore the activity was not conducted in an inappropriate place. We conclude that the rules concerning abnormally dangerous activities do not apply to the drilling of monitoring wells under the circumstances of this case. Therefore, the vicarious liability rule of section 427A does not apply. The trial court was correct in refusing to hold as a matter of law that Texaco was strictly liable for the release of petroleum from the Hagens' tank.

B. *Seneca.* Seneca claims that its actions in hiring J & R and in identifying the location of the wells were not a proximate cause of the release. The Board responds that Seneca's employment of J & R makes it liable under the vicarious liability rule for abnormally dangerous activities. It further argues that Seneca's performance of its responsibility to locate the wells makes it strictly liable.

We agree with Seneca that its employment of J & R does not make it vicariously liable for the same reasons that Texaco is not liable for the actions of Seneca. The rule of vicarious liability for abnormally dangerous activities does not apply.

 However, we disagree with Seneca that its conduct in marking the location for the drilling was not a proximate cause of the release. Seneca wants us to view its role in a very narrow sense—correct placement of the manways on the Friday before the concrete was poured. However, the undisputed facts show that Seneca's involvement was not so narrow.

Seneca's obligation was to inform J & R of the correct location to drill the monitoring wells. It failed to do so. Whether this failure is attributable to negligence by Seneca or the conduct of some unknown person in moving the manway is irrelevant because Seneca is strictly liable to the Board. Clearly the location of the manways was a cause in fact of the release. Because Seneca was responsible for identifying the drilling sites for J & R, Seneca's conduct, whether in the form of action or inaction, was a cause in fact of the release as a matter of law.

Therefore, we must address an additional argument made by both Seneca and J & R. They claim that the conduct of the Hagens in refilling the tank with petroleum even though they should have known the tank had been punctured was an intervening superseding cause of the release. We must decide whether this fact is material—in other words, would the existence of this fact affect the outcome of the lawsuit as it pertains to the liability of Seneca and J & R. We conclude it would not because the conduct of the Ha-

gens is not a superseding cause of the release for several reasons.

First, an intervening act may relieve a defendant of liability only if the intervening act was not reasonably foreseeable. *Haumersen,* 257 N.W.2d at 15. No reasonable mind could conclude that putting petroleum in an underground petroleum storage tank was not reasonably foreseeable. The occurrence of this event was one of the underlying premises of installing the monitoring wells in the first place—there would be no leakage of petroleum to detect unless petroleum was put in the tank.

The only aspect of the Hagens' conduct which makes their action even arguably unforeseeable was the allegedly negligent manner in which the Hagens acted. However, the fact that the Hagens may have been negligent in refilling the tank does not necessarily make their conduct unforeseeable. *Iowa Elec. Light & Power Co. v. General Elec. Co.,* 352 N.W.2d 231, 235–36 (Iowa 1984) (applying Restatement §§ 442, 443, 447). An intervening act is not a superseding cause merely because it is negligent if "a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted." Restatement § 447(b).

The defendants claim that the Hagens should have been alerted to the hole in their tank because a check on the amount of petroleum in the tank after the drilling showed an increase of 209 gallons over what had been there before the drilling even though no petroleum had been added. (The parties theorize that rock and dirt fell into the tank through the hole, causing the petroleum level in the tank to rise.) However, we think as a matter of law it is not "extraordinary" for a tank owner to refill a tank under these circumstances. Surely a reasonable person would not consider it extraordinary that the owners failed to recognize that an *increased* level of petroleum in the tank suggested the existence of a hole because one would ordinarily expect leakage from the hole and consequently a lower level of petroleum in the

tank. Therefore, the allegedly negligent nature of the Hagens' conduct is not sufficient to make their otherwise foreseeable action a superseding cause of the release.

Second, what the defendants are really arguing is that the Hagens should have discovered the condition created by the defendants and corrected that condition before it caused harm. However, the failure of a third person to prevent harm to another threatened by the original tortfeasor's conduct is not a superseding cause. Restatement § 452(1); *accord Stevens v. Baggett,* 154 Ga.App. 317, 268 S.E.2d 370, 373–74 (1980); *Levitan v. Banniza,* 34 Tenn.App. 176, 236 S.W.2d 90, 93 (1951); 57A Am. Jur.2d §§ 579, 668 (1989).

The third and final reason that the Hagens' conduct is not a superseding cause of the release is that the Hagens' conduct caused the same harm as that risked by Seneca's and J & R's initial conduct. *See Reed v. Chrysler Corp.,* 494 N.W.2d 224, 231 (Iowa 1992) (Carter, J., concurring in part and dissenting in part); Restatement § 442B. Section 442B states this rule:

> Where the negligent [6] conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

Applying this rule to the facts of this case, if the conduct of Seneca and J & R created the risk of a release of petroleum from the underground tank, the fact that the release occurred through the act of the Hagens in refilling the tank does not relieve Seneca and J & R from liability unless the release was intentionally caused by the Hagens. The defendants make no claim that the Hagens intentionally caused the release of petroleum from the underground storage tank. There-

---

**6.** Although this rule refers to the tortfeasor's "negligent" conduct, we have already decided

that we will apply traditional rules of proximate cause in this strict liability action.

fore, this rule applies and prevents the Hagens' action from being a superseding cause.

Viewing the facts in the light most favorable to the defendants, we conclude that the Hagens' conduct was not a superseding cause as a matter of law. *Kelly*, 476 N.W.2d at 349–52 (holding that intervening act was a superseding cause as a matter of law); *Leaders v. Dreher*, 169 N.W.2d 570, 576 (Iowa 1969) (holding that intervening act was not a superseding cause as a matter of law because the intervening act was a normal consequence of the tortfeasor's conduct); *cf. Schnebly v. Baker*, 217 N.W.2d 708, 728–31 (Iowa 1974) (holding that there was insufficient evidence to support trial court's factual finding that intervening act was a superseding cause). Therefore, Seneca's conduct is, as a matter of law, a proximate cause of the release of petroleum from the Hagens' tank and Seneca is liable as a matter of law. The district court erred in failing to grant the Board partial summary judgment on this issue.

■■■ C. *J & R Drilling.* The undisputed facts show that J & R drilled the well that punctured the underground tank. They also establish that this puncture allowed the escape of petroleum from the tank. Despite the actions of others before or after the puncture of the tank, J & R's conduct was, as a matter of law, a cause in fact of the release.

Nevertheless, J & R argues that the factual disputes which admittedly exist here make it impossible for the court to rule as a matter of law that it is "liable for the release." J & R claims that the action of someone in moving the manway and the Hagens' action in filling the tank were intervening superseding causes of the release.

■■■ We have already explained why the Hagens' conduct was not a superseding cause. We also conclude that someone's act in moving the manway is not a superseding cause. The altered location of the manway occurred before J & R's action in puncturing the tank. It cannot be a superseding cause of the release because it was not an intervening cause. *Marti*, 290 N.W.2d at 586 (an intervening cause is one that occurs after the defendant has acted). Therefore, this factual

dispute does not affect whether J & R is liable for the release.

Since J & R's conduct was a proximate cause of the release, it is liable as a matter of law. The district court erred in refusing to grant the Board partial summary judgment on the issue of J & R's liability.

VIII. *Apportionment of Fault to the Owner.*

The district court ruled that the Board's recovery from the defendants could be reduced by the percentage of fault assigned to the Hagens. The Board claims this ruling is an erroneous interpretation of chapter 455G.

The defendants argue that the Board has no independent claim against the defendants and is merely subrogated to the rights of the Hagens. Therefore, the defendants conclude, any defenses they have against the Hagens, such as comparative fault, necessarily apply to the Board's claim against the defendants. *Bales v. Warren County*, 478 N.W.2d 398, 400 (Iowa 1991) (subrogated party's claim is subject to the same defenses as the party to whom he is subrogated). We reject this argument because we think section 455G.13(1) gives the Board a direct cause of action against potentially responsible parties.

■■■ Section 455G.13(1) requires the Board to recover the costs of any corrective action from potentially responsible parties. Iowa Code § 455G.13(1) (1993). Additionally, the statute allows the Board to "proceed directly against" an allegedly responsible party even though that party is protected by a risk-shifting agreement. *Id.* § 455G.13(8). The independent nature of the Board's cause of action is shown by the ability of the Board to also recover its reasonable attorney fees and costs of litigation. *See id.* § 455G.13(1). These expenses are not damages that would be recoverable by the Board as a subrogee of the tank owner. Consequently, the rights given to the Board in section 455G.13 are broader than mere subrogation rights.

The defendants rely on section 455G.13(10) to support its argument that the Board's cause of action is based on subrogation. That section provides in part:

Upon payment by the fund for corrective action or third-party liability pursuant to this chapter, the rights of the claimant to recover payment from any potentially responsible party, are assumed by the board to the extent paid by the fund. A claimant is precluded from receiving double compensation for the same injury.

*Id.* § 455G.13(10). Although this section may give the Board subrogation rights, we think these rights do not detract from the independent action given the Board in section 455G.13(1). The fact that the Board has both subrogation rights and an independent cause of action is illustrated by the statute's reference in section 455G.13(6) to "a cost recovery or subrogation action provided for under this section."

██ Because the Board has an independent cause of action against potentially responsible parties such as the defendants, the Hagens' fault cannot be asserted against the Board as a defense under subrogation principles. Consequently, the defendants can apportion fault against the Hagens only insofar as permitted by chapter 668. Iowa Code section 668.3 allows fault to be apportioned among the claimant, the defendants, a person who has been released under section 668.7 and any third-party defendant.

The Hagens do not qualify as a "claimant" with respect to the Board's independent claim. The Hagens are "claimants" only as to their claim for damages not paid by the Board. As to the Board's independent claim against the defendants for the expenses incurred by the Board, the Board is the "claimant," not the Hagens.

Nor are the Hagens "defendants." The Board has not named them as defendants for purposes of recovering its expenses because the Board cannot do so under the statute. *See* Iowa Code § 455G.13(2)(a) (1993) (Board may not sue an eligible owner for expenses other than any unpaid copayment). Consequently, the Hagens are "parties" only if they qualify as a third-party defendant or a party released pursuant to section 668.7.

The Hagens can never be third-party defendants because they cannot be sued by the defendants. Section 455G.13(9) states that a potentially responsible party may not seek contribution or any other recovery from an owner eligible for assistance. We have previously held that a defendant may not bring a third party into a lawsuit for the purpose of apportioning fault to that party without making some claim for relief against the third party. *Peterson v. Pittman,* 391 N.W.2d 235, 238 (Iowa 1986). Because the defendants are prevented by section 455G.13(9) from seeking affirmative relief from the Hagens, the defendants are also precluded from apportioning fault to the Hagens as third-party defendants.

We also think that the Hagens do not qualify as "a party released pursuant to section 668.7." Section 668.7 discusses the "effect of a release." It states that a "release, covenant not to sue, or similar agreement" between a claimant and a liable person discharges the released person from liability for contribution. It also provides that the claim of a releasing person against other persons is reduced by the percentage of fault assigned to the released party.

The first hurdle the defendants encounter in relying on section 668.7 is that there has been no "release, covenant not to sue, or similar agreement" between the Board and the Hagens. Ignoring the fact that the Hagens do not come within the literal terms of section 668.7, we will consider whether the legislature intended that eligible owners who cannot be sued by the Board or other potentially responsible parties are equivalent to released parties within the purview of section 668.7. We conclude they are not.

Chapter 455G has established a mechanism under which owners pay a fee and in return have limited exposure for cleanup costs necessitated by a leak from their tanks. Looking at chapter 455G with this narrow focus, an eligible owner seems similar to a released party. However, such an interpretation of chapter 455G is not warranted under our rules of statutory construction.

In deciding whether an owner is a released party for purposes of reducing the Board's recovery, we consider the goal of the legislation and the consequences of a particular construction. *Slager v. HWA Corp.,* 435 N.W.2d 349, 352 (Iowa 1989). We seek a

reasonable construction that will accomplish the purpose of the legislation and avoid absurd results. *First Iowa State Bank v. Iowa Dep't of Natural Resources,* 502 N.W.2d 164, 168 (Iowa 1993). Applying these principles of statutory construction, we think the legislature did not intend that the Board's recovery be reduced by the fault of the tank owner. We see several indications against such a result.

Chapter 455G was intended "to protect and improve the quality of Iowa's environment by correcting existing petroleum underground storage tank releases...." 1989 Iowa Acts ch. 131, § 2. The legislature stated in the act that an additional goal which should be recognized in the implementation and interpretation of the statute was "to provide adequate and reliable financial assurance for the costs of corrective action for preexisting petroleum underground storage tank releases." *Id.*

This legislative intent suggests that we interpret the act to achieve the goal of adequate financial resources to clean up existing contamination. Achievement of this goal is maximized by not reducing the Board's recovery based on the fault of the tank owner. As we have noted in a different context, "a slight difference in fault allocation may produce a substantial difference in recovery." *Pepper v. Star Equip., Ltd.,* 484 N.W.2d 156, 158 (Iowa 1992). Consequently, recognizing an eligible owner as equivalent to a released party could substantially reduce the recovery of the Board. Obviously, it is the possibility of that occurring here which causes the defendants to argue that the fault of the owners must be compared to their fault. We conclude that the consequence of interpreting a chapter 455G eligible owner to be a released party under chapter 668 is so contrary to the goal of the underground petroleum storage tank legislation that it could not have been the intent of the legislature.

An additional reason for our conclusion is the extensive protection from liability given to an eligible owner in chapter 455G. The legislature protected owners from claims for contribution by other potentially responsible parties. *See* Iowa Code § 455G.13(10) (1993). It also provided that any agreement shifting liability to an eligible owner is "null and void." *See id.* § 455G.13(8). There is no indication in the legislation enacting chapter 455G that other potentially responsible parties should benefit from the protection of an eligible owner rather than the fund created to clean up petroleum contamination. Yet the interpretation urged by the defendants would do just that—interpret a statute intended to maximize environmental cleanup to benefit third persons whose conduct caused the contamination. We cannot accept such an interpretation of chapter 455G.

The trial court erred in ruling that fault may be apportioned to an eligible owner. We reverse the district court's decision on this legal issue.

IX. *Summary.*

The district court correctly refused to grant the Board partial summary judgment on the issue of Texaco's liability for the release of petroleum from the Hagens' tank. However, we conclude that summary judgment should have been granted with respect to the liability of Seneca and J & R.

We also think the district court erred in holding that the fault of the Hagens could be used to reduce the recovery of the Board. We hold that an eligible owner's fault cannot be compared to that of other potentially responsible parties in a suit by the Board to recover its costs of corrective action.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**