**IOWA COMPREHENSIVE PETROLEUM UNDERGROUND STORAGE TANK FUND BOARD 990C80656, Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

No. C 95–3017.

United States District Court, N.D. Iowa, Central Division.

April 27, 1995.

Asst. Iowa Atty. Dean A. Lerner, for plaintiff Iowa Comprehensive Petroleum Underground Storage Tank Fund.

Michael J. Philippi, Coffield, Ungaretti & Harris, Chicago, IL, for defendant Amoco Oil Co.

## ORDER GRANTING MOTION TO REMAND

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................... 405

II. ANALYSIS ................................................ 407
    A. Removal and Remand ................................ 407
    B. Subject Matter Jurisdiction ...................... 408
    C. Factors in Determining Status of an Entity ........... 409
        1. Power to Sue and Be Sued in Its Own Name and to Enter into Contracts ...................................... 413
        2. Degree of Autonomy Over its Operations .................. 416
        3. Whether the Entity is Performing a Governmental or Proprietary Function ...................................... 417
        4. Whether an Entity has been Separately Incorporated ............ 420
        5. Whether Entity's Property is Immune From State Taxation ...... 420
        6. Local Law and Decisions ............................. 420
        7. Immunity ......................................... 420
        8. Fiscal Autonomy ................................... 420
    D. Conclusion ....................................... 422

Plaintiff's motion to remand to state court raises a nettlesome question of federal jurisdiction: is the Plaintiff, the Iowa Comprehensive Petroleum Underground Storage Tank Fund Board 990C80656 ("the Board"), a citizen of the State of Iowa for federal diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332? The Board contends that it is an arm or alter ego of the State of Iowa and, if that is true, under well established precedent, the Board would not be a citizen of the State of Iowa. Consequently, federal diversity of citizenship jurisdiction would not exist in this case, and remand to the state courts of Iowa would be required. Amoco counters that the Board is an independent agency of the State, not its alter ego. Likewise, if this is true, under equally well established precedent, the Board would be a citizen of the State of Iowa; and there is federal diversity of citizenship jurisdiction in this court pursuant to 28 U.S.C. § 1332. This issue is a close one—the parties have mustered substantial arguments on both sides of the question.

Resolution of this question is further complicated by the parties' disagreement—reflected to a certain degree in the somewhat limited case law on the subject—as to the appropriate legal test or analysis to be used in determining whether the Board is or is not a citizen of the State of Iowa. Placing this procedural dispute in the context it is due, another court recently observed that a preliminary jurisdictional skirmish such as this one, requiring determination of citizenship for diversity of jurisdiction purposes, "has nothing to do with the substance of the real world dispute between these parties, but simply resolves where to try their lawsuit." *University of Rhode Island v. A.W. Chesterton Co.*, 2 F.3d 1200, 1219 (1st Cir.1993) (Hornby, J., concurring). For the reasons that follow, this court concludes that the Board's motion to remand should be granted and the parties' lawsuit should be resolved where it began, in the state courts of Iowa.

## I. INTRODUCTION

On January 19, 1995, the Board filed its petition in the Iowa District Court for Butler County against Defendant Amoco Oil Company ("Amoco") asserting a cause of action under Iowa Code § 455G.13 to recover money expended from the Iowa Comprehensive Petroleum Underground Storage Tank Fund ("the Fund"). The Board also asserts claims against Amoco under the Iowa common law for negligence. In 1989, the Iowa legislature enacted comprehensive legislation concerning petroleum underground storage tanks.[1] 1989 Iowa Acts ch. 131; *See Hagen v. Texaco*

---

1. The preamble to the legislation states:
    AN ACT RELATING TO PETROLEUM UNDERGROUND STORAGE TANKS, BY CREATING A STATE FUND AND AN ADMINISTRATIVE BOARD AND PROCEDURES FOR THE FUND, AUTHORIZING THE FUND TO EX-

*Refining & Mktg., Inc.*, 526 N.W.2d 531, 535 (Iowa 1995). This legislation is codified in Iowa Code ch. 455G. *See Hagen,* 526 N.W.2d at 535. The legislation established the Fund which is administered by the Board. *See id.;* Iowa Code §§ 455G.3–4. The Board is made up of six members, consisting of the following: the director of the department of natural resources, or the director's designee; the treasurer of state, or the treasurer's designee; the commissioner of insurance, or the commissioner's designee; the director of the legislative fiscal bureau, or the director's designee; and two public members appointed by the governor.[2] *See* Iowa Code § 455G.4(1)(a)-(e). The Fund was established to assist owners and operators of businesses with petroleum underground storage tanks to comply with federal financial responsibility requirements.[3] The Fund was also designed to provide a fund for the cleanup of petroleum releases, and a mechanism to cover the costs of remedial actions for preexisting releases from petroleum underground storage tanks. It is the cost recovery enforcement provisions of the Fund, *see* Iowa Code § 455G.13, which the Board is attempting to enforce in this action. The Board asserts that Amoco owned underground storage tanks from which petroleum was released, and that in response to this leak the Board has expended money from the Fund for corrective action. The Board requests judgment against Amoco for the costs of corrective actions taken to remediate the site pursuant to Iowa Code §§ 455G.13(1) & (7).

Amoco is a corporation not organized under the laws of the state of Iowa, with its principal place of business outside the state of Iowa.[4] On February 21, 1995, Amoco filed a petition for removal of this case to federal court pursuant to 28 U.S.C. § 1441. Amoco's basis for removal was diversity of citizenship pursuant to 28 U.S.C. § 1332.[5] On February 27, 1995, the Board filed its motion to remand to state court. The Board argues that it is not a citizen of the State of Iowa for the purposes of diversity of citizenship because it is an arm of the State of Iowa or its alter ego; and this court therefore lacks jurisdiction under section 1332. Amoco filed a timely resistance to the Board's motion and argues that the Board is an entity independent of the State of Iowa and thus is a "citizen" of the State of Iowa for diversity purposes.

A hearing on the Board's motion was held on April 21, 1995. At the hearing the Board was represented by Assistant Iowa Attorney General Dean A. Lerner. Amoco was represented by Michael J. Philippi of Coffield,

---

PEND MONEYS FOR REMEDIAL ACTION, TANK IMPROVEMENT LOAN GUARANTEES, AND THE OFFERING OF INSURANCE TO SATISFY FEDERAL PROOF OF FINANCIAL RESPONSIBILITY REQUIREMENTS, IMPOSING AN ENVIRONMENTAL PROTECTION CHARGE ON PETROLEUM DIMINUTION AND PROVIDING FOR THE COLLECTION OF THE CHARGE, INCREASING THE STORAGE TANK MANAGEMENT FEE, AUTHORIZING REVENUE BOND ISSUES AND THE CREATION OF CAPITAL RESERVE FUNDS TO ASSURE AND FACILITATE TIMELY PAYMENT OF REVENUE BOND OBLIGATIONS, AUTHORIZING A LOCAL OPTION REMEDIAL ACTION PROPERTY TAX CREDIT, PROVIDING CIVIL AND CRIMINAL PENALTIES, PROVIDING FUTURE AUTOMATIC REPEALS, AND PROVIDING EFFECTIVE DATES.
1989 Iowa Acts Ch. 131.

2. The director of the legislative fiscal bureau, or his designee, is a non-voting member of the Board. Iowa Code § 455G.4(1)(e).

3. Although the legislative history of Iowa Code chapter 445G does not state what federal law the chapter was in response to, under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6991, the administrator was authorized to establish financial responsibility regulations for owners and operators of underground storage tanks. *See* 42 U.S.C. § 6991b(d)(5)(B). Under RCRA, states may establish programs for regulating underground storage tanks. *See* 42 U.S.C. § 6991c.

4. The petition indicates that Amoco is a Maryland corporation registered to do business in the State of Iowa. *Petition at Count I, ¶ 5. In its* petition for removal, Amoco declares that it is incorporated in Maryland with its principal place of business in the State of Illinois. Removal Pet. at ¶ 6.

5. Under 28 U.S.C. § 1332, United States District Courts have original jurisdiction over:

(a) ... all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—(1) citizens of different States....
28 U.S.C. § 1332(a)(1).

Ungaretti & Harris, Chicago, Illinois. The parties have filed thorough and extensive briefs and both counsel presented superb oral argument in support of their respective positions. This matter is now deemed fully submitted. Although not free from doubt, for the reasons set forth below, the court concludes the Board is the alter ego of the State of Iowa and, as such, there is no diversity of citizenship jurisdiction in this court under 28 U.S.C. § 1332.

## II. ANALYSIS

### A. Removal and Remand

The grounds and procedures for removal of a state court proceeding to federal court and for remand to state court are stated in three statutes, 28 U.S.C. §§ 1441, 1446, and 1447. The statute identifying removable actions, 28 U.S.C. § 1441, states in pertinent part:

(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court *of which the district courts of the United States have original jurisdiction,* may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a) (emphasis added).

The procedure and grounds for a challenge to removal are stated in 28 U.S.C. § 1447:

(c) A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the

---

filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded....

28 U.S.C. § 1447(c).[6]

■■■ As the party seeking removal and opposing remand, Amoco has the burden of establishing federal subject matter jurisdiction. *See In re Business Men's Assurance Co. of America,* 992 F.2d 181, 183 (8th Cir. 1993); *Bor–Son Bldg. Corp. v. Heller,* 572 F.2d 174, 181 n. 13 (8th Cir.1978); *see also Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921); *Mulcahey v. Columbia Organic Chem. Co., Inc.,* 29 F.3d 148, 151 (4th Cir.1994). The court's removal jurisdiction must be strictly construed. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); *Mulcahey,* 29 F.3d at 151. Furthermore, the district court is required to resolve all doubts about federal jurisdiction in favor of remand. *In re Business Men's Assurance Co.,* 992 F.2d at 183 (citing *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987), *cert. denied,* 484 U.S. 1021, 108 S.Ct. 739, 98 L.Ed.2d 756 (1988)). In general, remand orders issued under 28 U.S.C. § 1447(c) are not reviewable by appeal or writ of mandamus. *In re Business Men's Assurance Co.,* 992 F.2d at 183; *see also Thermtron Prods., Inc. v. Hermansdorfer,* 423 U.S. 336, 342–43, 96 S.Ct. 584, 588–89, 46 L.Ed.2d 542 (1976) (remand orders unreviewable whether or not deemed to be erroneous by appellate court

---

6. The procedure for removal is stated in 28 U.S.C. § 1446, which provides in pertinent part:

(a) A defendant or defendants desiring to remove any civil action or criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

If the case stated in the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 [diversity] of this title more than 1 year after commencement of the action.

28 U.S.C. § 1446(a)–(b).

except when based on grounds outside § 1447(c)); *Carr v. American Red Cross,* 17 F.3d 671, 679 (3d Cir.1994) (citing *Thermtron* for the unreviewability of remand orders); *Farm Credit Bank v. Finstrom,* 888 F.2d 559 (8th Cir.1989) *(per curiam )* (remand orders unreviewable). *But see LaFarge Coppee v. Venezolana De Cementos, S.A.C.A.,* 31 F.3d 70, 72 (2d Cir.1994) (identifying circumstances in which remand is reviewable and citing cases so holding in those circumstances). The reason such orders are not reviewable is to allow state court actions to proceed without delay if the district court remanded for lack of jurisdiction. *Linton v. Airbus Indus.,* 30 F.3d 592, 596 (5th Cir.) (also reiterating a prior holding that absence of removal jurisdiction is an unreviewable remand for a procedural defect), *cert. denied,* —— U.S. ——, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994).

■ Obviously, a United States District Court may accept a case upon removal from a state court only if the case is one which could have been brought in federal court originally. *See Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987). In this case, Amoco removed this case to federal court pursuant to 28 U.S.C. § 1441(a) based upon its assertion that the Board is an entity independent of the State of Iowa such as to qualify as a "citizen" under 28 U.S.C. § 1332. The Board seeks a remand to the state courts of Iowa pursuant to 28 U.S.C. § 1447(c). Here, neither side disputes the amount in controversy requirement. Rather, the fighting issue between the parties is the diversity of citizenship requirement.

**B. Subject Matter Jurisdiction**

■ The court's analysis of this issue begins with the statement of certain fundamental jurisdictional principles. The federal district courts have always been courts of limited jurisdiction. *See* U.S. CONST., Art. III, § 1. "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equip. Management Co. v. United States,* 4 F.3d 643, 646

(8th Cir.1993) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501, *reh'g denied,* 476 U.S. 1132, 106 S.Ct. 2003, 90 L.Ed.2d 682 (1986), citing in turn *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60); *see also Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1171 (8th Cir.1994) (federal court jurisdiction limited by Article III of the Constitution). A federal court therefore has a duty to assure itself that the threshold requirement of subject matter jurisdiction has been met in every case. *Bradley v. American Postal Workers Union, AFL–CIO,* 962 F.2d 800, 802 n. 3 (8th Cir. 1992); *Thomas v. Basham,* 931 F.2d 521, 523 (8th Cir.1991); *Jader v. Principal Mut. Life Ins. Co.,* 925 F.2d 1075, 1077 (8th Cir.1991); *Barclay Square Properties v. Midwest Fed. Sav. & Loan Ass'n,* 893 F.2d 968, 969 (8th Cir.1990); *Sanders v. Clemco Indus.,* 823 F.2d 214, 216 (8th Cir.1987). "Jurisdiction of the lower federal courts, both original and removal, is entirely a creature of statute." *Hurt v. Dow Chemical Co.,* 963 F.2d 1142, 1145 (8th Cir.1992); *Continental Cablevision v. United States Postal Serv.,* 945 F.2d 1434, 1435 (8th Cir.1991). If one of the statutory requirements is not met, the district court has no jurisdiction. *Continental,* 945 F.2d at 1435.

■ Lack of subject matter jurisdiction requires remand to the state court. *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 16–18, 71 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951). Where the district court does not have original jurisdiction for want of subject matter jurisdiction, removal is improper and the case must be remanded under the terms of § 1447(c). *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 87, 111 S.Ct. 1700, 1709, 114 L.Ed.2d 134 (1991); *Shaw v. Dow Brands, Inc.,* 994 F.2d 364, 366 (7th Cir.1993) ("Any defect in the removal procedure, or the lack of subject matter jurisdiction, requires a remand.").

■ It is well established that a state is not a "citizen" for purposes of diversity jurisdiction. *See Moor v. Alameda County,* 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *Postal Telegraph Cable*

*Co. v. Alabama,* 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed. 231 (1894); *see also Illinois v. City of Milwaukee,* 406 U.S. 91, 97 n. 1, 92 S.Ct. 1385, 1390 n. 1, 31 L.Ed.2d 712 (1972); *University of Rhode Island v. A.W. Chesterton Co.,* 2 F.3d 1200, 1202 (1st Cir. 1993); *Northeast Fed. Credit Union v. Neves,* 837 F.2d 531, 533 (1st Cir.1988); *Wisconsin v. Maryland Nat'l Bank,* 734 F.2d 1015, 1016 (4th Cir.1984); *Indiana Port Comm'n v. Bethlehem Steel Corp.,* 702 F.2d 107, 109 (7th Cir.1983); *Tradigrain v. Mississippi State Port Auth.,* 701 F.2d 1131, 1132 (5th Cir.1983). It is equally well established law that "a political subdivision of a state, unless it is simply 'the arm or alter ego of the state,' is a citizen of the state for diversity purposes." *Moor,* 411 U.S. at 717, 93 S.Ct. at 1800 (citation omitted). The "alter ego" status of a political subdivision is generally determined by examining state law. *Id.* at 718–20, 93 S.Ct. at 1800–01. Here, if the Board is an alter ego of the State of Iowa, this court lacks diversity jurisdiction, and the Board's motion to remand must be granted. Neither the Board nor Amoco disputes these well settled diversity of citizenship principles.

### C. Factors in Determining Status of an Entity

■ The question of what should be the appropriate approach for determining whether the Board constitutes a citizen of the State of Iowa for the purposes of diversity, however, is not well settled—particularly in our circuit. A number of circuits have adopted a multifactor analysis, the origin of which initially developed in discerning whether an entity is an arm of the state for Eleventh Amendment immunity purposes—not for determining the status of an entity for diversity purposes. *See University of Rhode Island,* 2 F.3d at 1202; *Neves,* 837 F.2d at 534. On the question of diversity, other decisions have spoken of the necessity of determining whether the state is the real party in interest. *See Krisel v. Duran,* 386 F.2d 179, 181 (2d Cir.), *cert. denied,* 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1967) ("For the purpose of diversity jurisdiction, the determinative factor is whether the state is the real party in interest."). Yet, other cases have talked about discerning whether the state is the real party in interest through a multifactor approach. *Tradigrain,* 701 F.2d at 1132. The Eighth Circuit itself has yet to declare what is the proper test to be employed when determining the status of an entity for diversity purposes. The Eighth Circuit, however, in *Sherman v. Curators of Univ. of Mo.,* 16 F.3d 860, 865 n. 6 (8th Cir.1994), has adopted a multifactor approach when confronting issues of Eleventh Amendment immunity. Here, Amoco asserts that the multifactor approach established in *Sherman* by the Eighth Circuit in evaluating whether an entity constitutes a citizen for Eleventh Amendment immunity purposes should be used in this instance to determine whether the Board is a citizen of the State of Iowa for diversity purposes. The Board, on the other hand, contends that the court's inquiry should focus on whether the State of Iowa is the real party in interest in this litigation. Therefore, in order to determine what the appropriate test to employ in this case should be, the court must first examine the test developed by the Eighth Circuit in the context of evaluating claims of Eleventh Amendment immunity, and then determine if that approach may also be applied in determining an entity's status for the purposes of diversity. If so, the court must then determine whether to employ this multifactor test, some derivation of the same, or some other test.

In the context of determining whether an entity is an "arm or alter ego" of the state for Eleventh Amendment immunity purposes, the Eighth Circuit has enumerated a number of factors to be considered in that analysis. *See Sherman v. Curators of Univ. of Mo.,* 16 F.3d 860, 865 n. 6 (8th Cir.1994); *Greenwood v. Ross,* 778 F.2d 448, 453 (8th Cir.1985). A number of federal courts have held that the criteria used for evaluating whether an entity constitutes a citizen for diversity purposes is "substantially similar" to the criteria employed for determining if an entity enjoys a state's Eleventh Amendment sovereign immunity. *See University of Rhode Island,* 2 F.3d at 1203; *see also Neves,* 837 F.2d at 534 ("pretty much the same"); *cf. Coastal Petroleum Co. v. U.S.S. Agri–Chemicals,* 695 F.2d 1314, 1318 (11th

Cir.1983) (same analysis for determining "citizen" status for diversity as for determining Eleventh Amendment immunity); *Krieger v. Trane Co.*, 765 F.Supp. 756, 758 (D.D.C.1991) (concluding that there is no difference in tests for diversity and Eleventh Amendment immunity).

In *Sherman,* the court approved of the nine factors identified by the Third Circuit in *Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303, 1309 (3d Cir.1987), for use in evaluating whether an entity has Eleventh Amendment immunity status:

> (1) local law and decisions defining the status and nature of the agency involved in its relation to the sovereign; (2) most importantly, whether the payment of the judgment will have to be made out of the state treasury; (3) whether the agency has the funds or the power to satisfy the judgment; (4) whether the agency is performing a governmental or proprietary function; (5) whether it has been separately incorporated; (6) the degree of autonomy over its operations; (7) whether it has the power to sue and be sued and to enter into contracts; (8) whether its property is immune from state taxation; and (9) whether

the sovereign has immunized itself from responsibility for the agency's operations.

*Sherman,* 16 F.3d at 865 n. 6.

The First Circuit has identified virtually the same criteria, as set out in *Sherman,* for Eleventh Amendment determination:

> whether the entity (1) performs an "essential" or "traditional" governmental function, as opposed to a nonessential or merely proprietary one; (2) exercises substantial autonomy over its internal operations; (3) enjoys meaningful access to, and control over, funds not appropriated from the State treasury; (4) possesses the status of a separate "public corporation"; (5) may sue and be sued in its own name; (6) can enter into contracts in its own name; (7) has been granted a state tax exemption on its property; or (8) has been expressly debarred from incurring debts in the State's name or behalf.

*University of Rhode Island,* 2 F.3d at 1205 (citing *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935, 939–40 (1st Cir.1993)) [7]. These same factors have been applied in the context of determining whether an entity is an arm of the state for

---

**7.** In addition to the Eighth Circuit in *Sherman,* the Third Circuit in *Kovats,* and the First Circuit in *University of Rhode Island* other circuits have applied multifactor approaches in determining an entity's status. *Lewis v. Midwestern State Univ.*, 837 F.2d 197, 198 (5th Cir.1988) (three factors considered: the status of the entity under state law; the degree of state control over the entity, and whether a money judgment against the entity would, because of the status of the entity's funds, interfere with the fiscal autonomy of the state), *cert. denied,* 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988); *Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218, 224–28 (D.C.Cir.1986) (three factors looked to were the nature of entity created by state law, the degree of control state has over entity, and whether state treasury is responsible for judgments against the entity); *Hughes–Bechtol, Inc. v. West Virginia Bd. of Regents*, 737 F.2d 540, 543–44 (6th Cir.) (two factors considered by court were whether entity had funds or ability to respond to damages, and whether the entity can claim immunity under state law), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Coastal Petroleum Co.*, 695 F.2d at 1318 (looking to the following five factors: "whether the agency can be sued in its own name; (2) whether the agency can implead and be implead-

ed in any competent court; (3) whether the agency can contract in its own name; (4) whether the agency can acquire, hold title to, and dispose of property in its own name; and (5) whether the agency can be considered a "body corporate" having the rights, powers and immunities incident to corporations."); *Tradigrain,* 701 F.2d at 1132 (factors considered were the entity's right to hold and use property; its authority to sue and be sued in its corporate name; the extent of its independent management authority; the treatment of the entity by the state's courts; the extent to which the state is responsible for the entity's debts; the extent of the entity's concern with statewide as opposed to local problems; and the degree of financial autonomy of the agency); *United Carolina Bank v. Board of Regents of Stephen F. Austin State Univ.*, 665 F.2d 553, 557–61 (5th Cir.1982) (three factors considered: the status of the entity under state law; the degree of state control over the entity; and whether a money judgment against the entity would, because of the status of the entity's funds, interfere with the fiscal autonomy of the state). It must be pointed out that the factors employed in each of these cases are either explicitly delineated in *Sherman,* or are closely related to a *Sherman* factor.

the purposes of diversity.[8] *See University of Rhode Island*, 2 F.3d at 1205. Similarly, the court concludes that the *Sherman* factors may also be employed in an analysis of whether an entity is a citizen for the purposes of diversity.

The Board asserts in its supplemental reply brief that the multiple factor approach adopted and employed by courts in resolution of Eleventh Amendment immunity questions should give way when the issue before the court concerns diversity jurisdiction. When diversity is the issue, the Board suggests that the proper inquiry is whether the state is the real party in interest. Although the nomenclature may differ in the cases cited by the Board in support of this proposition, the court seriously questions whether a separate and distinct test can be discerned from these cases. Furthermore, even if a separate test can be divined from the cases cited by the Board, the court believes that the multiple factor approach is a more thorough and exacting test, and the one which should be employed regardless of whether the question before the court is diversity or Eleventh Amendment immunity. Finally, the court is of the opinion that even if a separate real party in interest test exists, the result reached in this case would not differ based on application of that test. The court will now turn to an examination of some of the cases relied upon by the Board to support its position on this matter.

The Board first cites the district court decision in *Pennsylvania Human Relations Comm'n v. USAir, Inc.*, 615 F.Supp. 75

(W.D.Pa.1985). In *USAir, Inc.*, the Pennsylvania Human Relations Commission filed charges against USAir for age discrimination in the workplace. *Id.* at 76. Prior to a public hearing on the allegations, USAir removed the petition to federal court, and the Commission then sought to have the matter remanded. *Id.* Before commencing its analysis, the court framed the inquiry:

> In the present case, if the Commission is *an alter ego* of the Commonwealth of Pennsylvania, the state is *the real party in interest* and plaintiff's motion to remand must be granted.

* * * * *

> (6) When analyzing the citizenship or immunity status of state agencies, the inquiry narrows to the question whether the state is the real party in interest or, phrased another way, whether the agency is an arm or alter ego of the state.

*Id.* at 77 (emphasis added). Obviously, the court was not distinguishing between the terms "real party in interest" and "arm or alter ego", but instead was using them synonymously. The court proceeded to note that inquiries concerning the citizenship of an entity for diversity or immunity purposes was "almost identical." *Id.* Indeed, the court went on to set out and apply the seven factors identified in *Urbano v. Board of Managers of New Jersey State Prison*, 415 F.2d 247, 251 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970),

---

**8.** The majority of the cases discussing whether an entity is an arm of the state, either for diversity purposes or in the context of the Eleventh Amendment immunity, have concerned the relationship between a college or university and a state. On that score, the majority of the courts have concluded that state supported universities and colleges are arms of the state for diversity or Eleventh Amendment immunity purposes. *See Lewis*, 837 F.2d at 199; *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir.), *cert. denied*, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987); *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 307 (6th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985); *Cannon v. University of Health Sciences/The Chicago Medical Sch.*, 710 F.2d 351, 357 (7th Cir. 1983); *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir.1982); *United Carolina Bank*, 665

F.2d at 558; *Rutledge v. Arizona Bd. of Regents*, 660 F.2d 1345, 1349 (9th Cir.1981), *aff'd sub nom., Kush v. Rutledge*, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Ronwin v. Shapiro*, 657 F.2d 1071, 1073 (9th Cir.1981); *Perez v. Rodriguez Bou*, 575 F.2d 21, 25 (1st Cir.1978); *Jagnandan v. Giles*, 538 F.2d 1166, 1173 (5th Cir.1976), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977); *Prebble v. Brodrick*, 535 F.2d 605, 611 (10th Cir.1976); *Walstad v. University of Minn. Hosps.*, 442 F.2d 634, 641–42 (8th Cir.1971); *Van Pilsum v. Iowa State Univ. of Science and Technology*, 863 F.Supp. 935, 939 (S.D.Iowa 1994). *But see University of Rhode Island*, 2 F.3d at 1209; *Kovats*, 822 F.2d at 1310; *Samuel v. University of Pittsburgh*, 375 F.Supp. 1119 (W.D.Pa.1974), *rev'd on other grounds*, 538 F.2d 991 (3d Cir.1976).

an Eleventh Amendment case.[9] Although the *USAir* court did note that it was attaching less significance to the first factor, whether state resources may be used to pay the judgment, because it was less helpful in the context of a diversity inquiry, the court nonetheless applied the same multifactor test used in Eleventh Amendment cases. *Id.*

The Board also directs the court's attention to the concurring opinions in *University of Rhode Island*, 2 F.3d at 1221, and *Ramada Inns, Inc. v. Rosemount Memorial Park Ass'n*, 598 F.2d 1303, 1308–09 (3rd Cir.1979). In Chief Judge Seitz's concurrence in *Ramada, Inns, Inc.*, he noted that he concurred because the Supreme Court precedent required "that the real party in interest inquiry followed here is to be applied to both the eleventh amendment and diversity issues." *Id.* at 1308. The majority's decision in *Ramada* equated "alter ego of the state" with the state being the "real party in interest", and applied a multifactor test. *Id.* at 1306. Judge Hornby indicates in his concurring opinion in *University of Rhode Island* that he would not employ the multifactor test used by the majority, but would instead simplify matters for all concerned by looking to the corporate nature of the entity, *University of Rhode Island*, 2 F.3d at 1220.[10] Judge

Hornby's analysis, thus, is not one grounded on whether the state is the real party in interest, but on whether, under state law, the entity has a "sufficiently independent corporate character". *Id.* at 1221. The Board's citation to the district court decision in *South Dakota State Cement Comm'n v. Wausau Underwriters Ins. Co.*, 778 F.Supp. 1515 (D.S.D.1991), is equally unavailing. Although the court noted that the primary question before it was whether the state was the real party in interest in the litigation, *id.* at 151n. 2, the court applied a multifactor approach derived in part from the Fifth Circuit's decision in *Tradigrain*, 701 F.2d at 1132. The factors identified in *Tradigrain* were the entity's right to hold and use property; its authority to sue and be sued in its corporate name; the extent of its independent management authority; the treatment of the entity by the state's courts; the extent to which the state is responsible for the entity's debts; the extent of the entity's concern with statewide as opposed to local problems; and the degree of financial autonomy of the agency. *Id.* These factors, however, are either identical to or derivations of factors employed by courts in resolving questions of Eleventh Amendment immunity.

9. The seven factors identified in *USAir, Inc.* are:

> Whether the agency performs a proprietary or governmental function; whether the agency is separately incorporated, has the power to sue and enter contracts, and has autonomy over its operations; whether agency property is immune from state taxation; and whether the state has immunized itself from responsibility for agency operations.

*USAir, Inc.*, 615 F.Supp. at 77 (citing *Urbano*, 415 F.2d at 251).

10. The thrust of Judge Hornby's well crafted concurring opinion in *University of Rhode Island* is encapsulated in the following quote:

> Granted that our system limits the jurisdiction of federal courts, a rational observer might nevertheless expect simple gatekeeping rules for what gets in and what is kept out. A litigant should be able to ascertain, with relatively modest effort and legal fees, where to bring its lawsuit. But if the court's analysis of "myriad factors"—which are "by no means exhaustive" is to be the governing standard, future litigants in cases involving similar state agencies had better be prepared to pay a lot of legal fees for their lawyers to (1) read and digest the prose; (2) gather the relevant infor-

> mation and apply the legal analysis to their client or opponent; (3) litigate the issues at pretrial, trial and on appeal. Those litigants had also better be prepared for delays in decisionmaking as lawyers and judges ponder the issue: the "myriad factors" will seldom yield a certain outcome until a court actually decides the issue.

> Simplicity from the courts of appeals (and the Supreme Court) on these gatekeeping and procedural issues will permit lawyers and judges—and most importantly, the parties—to deal with the merits of disputes in a simple and less costly manner. Needlessly complex jurisdictional rules like those the court advances here can only perplex the litigants as they pay mounting attorney fees and suffer through procedural delays.

*University of Rhode Island*, 2 F.3d at 1219–21. While I am sympathetic to Judge Hornby's criticism of the multifactor test, in the absence of controlling guidance from our circuit and because I believe the multifactor test represents the majority view and adequately, but perhaps awkwardly reflects the core judicial inquiry of whether an entity is independent or the alter ego of the State, I shall apply it in this case.

*See Sherman,* 16 F.3d at 865 n. 6; *Kovats,* 822 F.2d at 1309. Finally, the Board relies on Judge Stuart's decision in *Iowa v. Sellers,* 336 F.Supp. 816 (S.D.Iowa 1972), to support its proposition that the appropriate test to be applied in questioning an entity's status for diversity is to determine whether the state is the real party in interest. The *Sellers* decision in inapposite to the circumstances of the current action. In *Sellers,* which involved the forfeiture of bail bonds, the action was brought in the name of the State of Iowa in Iowa state court. *Id.* at 817. The defendants then removed the action to federal court on the grounds of diversity of citizenship and that a substantial constitutional question existed. *Id.* The State of Iowa then sought to have the case remanded on the grounds that no diversity of citizenship existed because the State of Iowa has no citizenship. *Id.* The defendants, however, argued that because the proceeds of the bond revocation would go to a county school fund, the State of Iowa had no interest in the action. *Id.* The issue before Judge Stuart was not what type of entity was before him, as is the case here, but rather whether the State of Iowa itself had an interest in the case. *Id.* at 817–18. Thus, the *Sellers* decision does not provide an analytical framework for determining the Board's status.

■ As noted above, the court concludes that the multifactor test is the most complete and exacting. Therefore, the court shall employ it here and, to the extent applicable, consider each of the *Sherman* factors *seriatim.*[11]

### 1. Power to Sue and Be Sued in Its Own Name and to Enter into Contracts

It is clear that under Iowa Code § 445G.13, the Board may bring suit. However, as the First Circuit pointed out in: "[t]he bare power to sue is unlikely to hold complete sway in the threshold 'alter ego'

determination either in diversity or immunity cases." *University of Rhode Island,* 2 F.3d at 1207. Furthermore, the Board's right to bring suit is not unlimited. Section 445G.13(10) provides that:

A claimant may elect to permit the board to pursue the claimant's cause of action for any injury not compensated by the fund against any potentially responsible party, *provided the attorney general determines such representation would not be a conflict of interest.*

*Id.* (emphasis added). As Assistant Iowa Attorney General Robert C. Galbraith indicates in his affidavit attached to the Board's brief in support of the motion to remand, counsel for cases are assigned by the Iowa Attorney General to one of three private firms that have contracts with the State of Iowa through the state executive counsel pursuant to Iowa Code § 13.7. The absence of authority to retain private counsel must be viewed as evidence of a lack of independence. *Cf. Jacintoport Corp. v. Greater Baton Rouge Port Comm'n,* 762 F.2d 435, 443 (5th Cir.1985) (holding that commission's ability to employ private attorneys weighed in favor of independence), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986). It must also be noted that the Board is represented in this action not only by private counsel, but also by the Iowa Attorney General's office. Thus, the situation here is inapposite to that found in *University of Rhode Island,* in which the First Circuit noted that the university's counsel of record was "not a legal officer of the State of Rhode Island." *University of Rhode Island,* 2 F.3d at 1207 n. 11.

Amoco also asserts that the Board has the power to enter into contracts in its own name and that this is an indicator of the Board's independence. The Board disputes this assertion. In setting out the general powers of the Board, sections 455G.6(6)–(7) declare that

In administering the fund, the board has all of the general powers reasonably necessary and convenient to carry out its pur-

---

11. Alternatively, the court's ultimate conclusion would be unaltered even if a separate real party in interest test is employed. As discussed above, the test employed in *USAir, Inc.,* 615 F.Supp. at 77, for determining whether the state is the real party in interest, requires an examination of seven factors, all of which the court will be required to examined in the context of the factors set out in *Sherman.*

poses and duties and may do any of the following, subject to express limitations contained in this chapter:

. . . . .

6. Contract for the acquisition, construction, or both of one or more improvements or parts of one or more improvements and for the leasing, subleasing, sale, or other disposition of one or more improvements in a manner it determines.

7. The board may contract with the authority for the authority to issue bonds and do all things necessary with respect to the purposes of the fund, as set out in the contract between the board and the authority. The board may delegate to the authority and the authority shall then have all of the powers of the board which are necessary to issue and secure bonds and carry out the purposes of the fund, to the extent provided in the contract between the board and the authority. The authority may issue the authority's bonds in principal amounts which, in the opinion of the board, are necessary to provide sufficient funds for the fund, the payment of interest on the bonds, the establishment of reserves to secure the bonds, the costs of issuance of the bonds, other expenditures of the authority incident to and necessary or convenient to carry out the bond issue for the fund, and all other expenditures of the board necessary or convenient to administer the fund. The bonds are investment securities and negotiable instruments within the meaning of and for purposes of the uniform commercial code.

Iowa Code § 455G.4(4) itself provides:

4. Public bid. All contracts entered into by the board, including contracts relating to community remediation, shall be awarded on a competitive basis to the maximum extent practical. In those situations where it is determined that public bidding is not practical, the basis for the determination of impracticability shall be documented by the board or its designee. This subsection applies only to contracts entered into on or after July 1, 1992.

5. Contract approval.

a. The board shall approve any contract entered into pursuant to this chapter if the cost of the contract exceeds seventy-five thousand dollars.

b. A listing of all contracts entered into pursuant to this chapter shall be presented at each board meeting and shall be made available to the public. The listing shall state the interested parties to the contract, the amount of the contract, and the subject matter of the contract.

c. The board shall be required to review and approve or disapprove the administrator's failure to approve a contract under section 455G.12A. Review by the board shall not be required for cancellation or replacement of a contract for a site included in a community remediation project or when an emergency situation exists.

Similarly, Iowa Code section 455G.5 concerns the Board's authority to contract with independent contractors:

The board shall administer the fund. A contract entered into on or after July 1, 1992, to retain a person to act as the administrator of the fund shall be subject to public bid. All other contracts to retain a person under this section shall be in compliance with the public bidding requirements of section 455G.4, subsection 4.

The board may enter into a contract or an agreement authorized under chapter 28E with a private agency or person, the department of natural resources, the Iowa finance authority, the department of revenue and finance, other departments, agencies, or governmental subdivisions of this state, another state, or the United States, in connection with its administration and implementation of this chapter or chapter 424 or 455B.

The board may reimburse a contractor, public or private, retained pursuant to this section for expenses incurred in the execution of a contract or agreement. Reimbursable expenses include, by way of example, but not exclusion, the costs of collecting the environmental protection charge or administering specific delegated duties or powers of the board.

Chapter 455G also refers to the Board's ability to contract in section 455G.12A.[12]

Although the Board clearly has the authority to contract for certain services, the Board's authority to contract is limited in both the type of contracts into which it can enter, the amount of the contracts, and the manner in which they are bid. Furthermore, chapter 455G is silent as to whether the Board may enter into contracts in its own name. In *Tradigrain,* 701 F.2d at 1133, the Fifth Circuit, in concluding that the Mississippi Port Authority was an alter ego of the State of Mississippi and therefore not a citizen for diversity purposes, noted that although the port authority could enter into contracts, it was required to advertise all contracts greater than $2500 and to award the contract to the lowest bidder. *Id.* Similar contracting limitations are placed on the board. *See* Iowa Code § 455G.4(5). Furthermore, the mere ability to contract is not conclusive evidence of independent status, especially when the powers are necessary for the entity to carry out its primary purpose. *See Kashani v. Purdue Univ.,* 813 F.2d 843, 847 (7th Cir.1987) (holding that university was entitled to Eleventh Amendment immunity where the trustees had the power to enter into contracts, to sue and be sued, settle lawsuits and engage in construction projects, such powers were granted the university only so that it could carry out its primary purpose of education); *Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 305 (6th Cir.1984) (holding that medical school was an arm of the state and thus immune from lawsuits even though trustees were empowered to "do all things necessary

12. Section 455G.12A, pertaining to cost containment authority, provides:

1. Validity of contracts. A contract in which one of the parties to the contract is an owner or operator of a petroleum underground storage tank, for goods or services which may be payable or reimbursable from the fund, is invalid unless and until the administrator has approved the contract as fair and equitable to the tank owner or operator, and found that the contract terms are within the range of usual and customary rates for similar or equivalent goods or services within the state, and found that the goods or services are necessary for the owner or operator to comply with fund or regulatory standards. An owner or operator may appoint the administrator as an agent for the purposes of negotiating contracts with suppliers of goods or services compensable by the fund. The administrator may select another contractor for goods or services other than the one offered by the owner or operator, if the scope of the proposed work or actual work of the offered contractor does not reflect the quality of workmanship required, or the costs are determined to be excessive.

2. Contract approval. In the course of review and approval of a contract pursuant to this section, the administrator may require an owner or operator to obtain and submit three bids, provided that the administrator coordinates bid submission with the department. The administrator may require specific terms and conditions in a contract subject to approval.

The board shall have authority to contract for site cleanup reports. The board's responsibility for site cleanup reports is limited to those site cleanup reports subject to approval by the department of natural resources and required in connection with the remediation of a release which is eligible for benefits under section 455G.9. The site cleanup report shall address existing and available remedial technologies and the costs associated with the use of each technology. The board shall not have the authority to affect a contract which has been given written approval under this section.

3. Exclusive contracts. The administrator may enter into a contract or an exclusive contract with the supplier of goods or services required by a class of tank owners or operators in connection with an expense payable or reimbursable from the fund, to supply a specified good or service for a gross maximum price, fixed rate, on an exclusive basis, or subject to another contract term or condition reasonably calculated to obtain goods or services for the fund or for tank owners and operators at a reasonable cost. A contract may provide for direct payment from the fund to a supplier.

The administrator may retain, subject to board approval, an independent person to assist in the review of work required in connection with a release or tank system for which fund benefits are sought, and to establish prevailing cost of goods and services needed. Nothing in this section is intended to preempt the regulatory authority of the department.

4. Prior approval by administrator. Unless emergency conditions exist, a contractor performing services pursuant to this section shall have the budget for the work approved by the administrator prior to commencement of the work. No expense incurred which is above the budgeted amount shall be paid unless the administrator approves such expense prior to its being incurred. All invoices or bills shall be submitted with appropriate documentation as deemed necessary by the board, no later than thirty days after the work has been performed. Neither the board nor an owner or operator is responsible for payment for work incurred which has not been previously approved by the board.

for the creation, proper maintenance, and successful and continuous operation of the college" including to "make and enter into all contracts and agreements necessary or incidental to the operation of such college."); *Krieger,* 765 F.Supp. at 760, 763 (holding that university was an arm of the District of Columbia even though the trustees were empowered to enter into contracts). *But see University of Rhode Island,* 2 F.3d at 1209 (holding that university was not alter ego of state where its powers included the ability to enter into contracts in its own name).

A further consideration on this issue, and indeed on all of the Board's enumerated powers, is the fact that the Board's authority to take such actions are specifically set forth in Iowa Code Chapter 455G, which can be amended or repealed at any time. *See Van Pilsum v. Iowa State Univ. of Science and Technology,* 863 F.Supp. 935, 939 (S.D.Iowa 1994) (concluding that university shared in the State of Iowa's Eleventh Amendment immunity where the university's statutory powers were all subject to amendment or repeal).

Therefore, while the Board does maintain certain powers to bring suit and to contract, when the limitations placed on these powers are factored into the calculus, the Board's authority to sue and contract do not weigh in favor of a finding of independence.

### 2. Degree of Autonomy Over its Operations

A second factor identified in *Sherman* is whether the entity has autonomy over it operations. *Sherman,* 16 F.3d at 865 n. 6. Amoco asserts that the Board has such autonomy. The Board disputes that assertion. While the statutory provisions concerning the Board provide the Board with authority and power to carry out the Fund's purposes, *see generally* Iowa Code § 455G.6, the provisions also evidence the substantial interplay and entanglement between the Board and the State of Iowa.

First, as was noted above, the majority of the Board itself is made up of either State of Iowa officials or their designees. *See* Iowa Code §§ 455G.4(1)(a)-(e). The only two public members are both appointed by the Governor of Iowa with approval by the Iowa Senate. The remaining members are either state officials or their designees. In the related context of appointment of university boards, courts have viewed such appointment procedures as evidencing an entity's lack of independence from state controls. *See University of Rhode Island,* 2 F.3d at 1207; *Lewis v. Midwestern State Univ.,* 837 F.2d 197, 198 (5th Cir.1988); *Kashani,* 813 F.2d at 847; *Hall,* 742 F.2d at 306; *United Carolina Bank v. Board of Regents,* 665 F.2d 553, 558 (5th Cir.1982). As the First Circuit recognized: "[t]he power of appointment (and reappointment) is significant, and may entail risks of subtle or indirect manipulation of the entity's decisionmaking processes by elected officials." *University of Rhode Island,* 2 F.3d at 1207. Here, the appointees to the Board have none of the statutory protections found in that decision. In *University of Rhode Island,* the board of trustees were insulated from "partisan or personal" pressures by the fact that board members could not be removed except for cause after a full hearing and appellate review. *University of Rhode Island,* 2 F.3d at 1207. Those protections are entirely absent from the legislative framework establishing the Board.[13]

Second, again as noted above, the Iowa Attorney General determines whether the Board will be permitted to pursue certain claims, *see* Iowa Code § 445G.13(10), and what legal counsel will be assigned to represent the Board in cost recover actions. *See* Galbraith Aff. at ¶ 3. Another consideration on this factor lies in the fact that the Iowa State Treasurer acts as custodian for the Fund and is responsible for disbursements of funds. Iowa Code § 455G.3(1). Additionally, the court notes that the Board is required to cooperate with the Iowa Department of Natural Resources in implementing and administering its duties under chapter 455G. *See* 455G.6(16). Finally, the court notes that

---

**13.** Of course, unlike the situation found in the *University of Rhode Island* decision, or other cases concerning appointments to a university's board of trustees, the Board's decisionmaking processes may be affected directly by state officials since they serve on the Board. Thus, the degree of entanglement between the Board and State of Iowa officials is more entwined here than in the university board of trustees cases.

the Board does not enjoy corporate status under Iowa law. This fact, combined with the less than full designation of corporate powers, indicates that the Board is not independent. *Cf. Hall,* 742 F.2d at 305–06 (noting fact that college had not been granted full corporate powers did not support a finding that college was independent). This fact also distinguishes this case from the circumstances found in *University of Rhode Island,* in which the university was denominated a "public corporation" which, under state law, was deemed to have " 'a distinct legal existence from the state …' " *University of Rhode Island,* 2 F.3d at 1206.

The court, therefore, concludes that this factor also weighs against a finding of independence.

### 3. Whether the Entity is Performing a Governmental or Proprietary Function

On this factor the parties disagree regarding the nature of the function of the Board.

On this factor, the Board has the better argument. In *Hagen,* the Iowa Supreme Court indicated the purpose of the Fund and the Board:

> Moneys in the fund are used in part for a "remedial program." *Id.* § 455G.9. This program provides assistance to eligible owners and operators of underground storage tanks for corrective action to cleanup existing petroleum contamination.

*Hagen,* 526 N.W.2d at 535 (footnote omitted).[14] The preamble to the enacting legislation indicates that one of the purposes behind the creation of the Fund and the Board is the expenditure of moneys from the Fund for remedial action. 1989 Iowa Acts Ch. 131. This public interest purpose is entirely consistent with the Iowa Legislature's specific findings supporting the passage of the legislation creating the Fund and the Board.[15] The Iowa Legislature's intent in passing the Iowa Comprehensive Petroleum Underground Storage Tank Fund Act was to pro-

14. "Corrective action" is defined in Iowa Code § 455G.2(6) as:

> an action taken to minimize, eliminate, or clean up a release to protect the public health and welfare or the environment. Corrective action includes, but is not limited to, excavation of an underground storage tank for the purposes of repairing a leak or removal of a tank, removal of contaminated soil, and cleansing of groundwaters or surface waters. Corrective action does not include replacement of an underground storage tank or other capital improvements to the tank. Corrective action specifically excludes third-party liability. Corrective action includes the expenses incurred to prepare a site cleanup report for approval by the department of natural resources detailing the planned response to a release or suspected release, but not necessarily all actions proposed to be taken by a site cleanup report.

15. The Iowa Legislature made the following findings with regard to the act creating the Fund and the Board:

> Section 1. Legislative findings. The following findings support the establishment of the Iowa comprehensive petroleum underground storage tank fund and imposition of the environmental protection charge authorized by this Act for the purposes of the fund:
>
> 1. Maintenance of Iowa's petroleum distribution network, particularly in rural Iowa, is dependent upon the provision of moneys to clean up existing petroleum releases and the availability of financing at affordable interest rates for petroleum underground storage tank improvements to permit compliance with mandated federal technical and financial responsibility standards.
>
> 2. Private financing at low-interest rates for small business owners and operators of petroleum underground storage tanks is generally not available due to the potential liability for petroleum releases which financial institutions are unwilling to incur and the high cost of compliance with federal regulatory standards.
>
> 3. It is necessary to provide a reasonable means to share the cost of cleanup of past and existing petroleum leaks to make the Iowa petroleum underground storage tank population insurable and environmentally safe, and to protect groundwater safety for the citizens of the state. Because of the nature of the problem of underground petroleum leaks and releases it is inherently difficult if not impossible to discover each release, past, present, and future, and to determine all the responsible parties, in a timely manner and with reasonable administrative expenses. Further, even if the responsible persons could be identified, the potential damages often far exceed an individual's ability to pay. The environmental protection charge is intended to have all potentially responsible parties pay in exchange for the availability of certain benefits to a responsible party who is able to be identified, subject to certain conditions.

**418**

The environmental protection charge is predicated on the amount of petroleum which is released or otherwise escapes from the petroleum distribution network within the state prior to being dispensed for its intended uses. After studying the issue of leaking underground storage tanks for more than two legislative sessions, including an interim study committee, and with reliance upon the active insurance division working group which included industry participation, the general assembly finds that a reasonable estimate of this "diminution" is one-tenth of one percent of the petroleum entering petroleum underground storage tanks. Various sources were relied upon in determining this diminution rate, including but not limited to the following:

a. Ernst and Whinney study for the Michigan Petroleum Association, which concluded that among various factors supporting Michigan's "shrinkage and evaporation tax credit" (substantially similar to Iowa's), "physical shrinkage" and "losses from other factors" (which included spillages) accounted for one and thirty-four hundredths percent of petroleum volume. Diminution is not identical to "shrinkage and evaporation" as used for tax credit purposes. Diminution contains no "administrative cost" consideration and is not primarily concerned with evaporation. Because of this, it is not significant that diesel, being significantly less volatile than gasoline, is less subject to evaporation. Diesel does experience spillage and leakage, and thus "diminution".

b. The Tillinghast actuarial study of the Iowa comprehensive petroleum underground storage tank fund prepared for the general assembly in 1987, and the studies of tank leak rates cited in the Tillinghast report, and various federal environmental protection agency reports collected by legislative staff and the general assembly, support the finding that all petroleum products, including gasoline and diesel fuel, experience diminution.

c. Analysis of the Iowa shrinkage and evaporation tax credit claims, a portion of which is attributable to product loss and spillage, using the Ernst and Whinney's approach, yields similar results, indicating that in Iowa, one and thirty-four hundredths percent of the total volume of petroleum products entering the state's petroleum distribution system is diminution, or loss of product into the environment.

d. The Alexander and Alexander actuarial report prepared for the general assembly in 1988, also supports the finding of diminution and the reasonableness of the diminution rate determined. The Alexander and Alexander report includes an opinion letter from Ernst and Whinney. The letter is based on the research performed for their Michigan study and information supplied to Ernst and Whinney regarding the Iowa tank population, Iowa's antidiversionary amendment, and the definition of diminution and diminution rate. The letter relates that the range of physical shrinkage was twenty-nine hundredths percent through nine-tenths percent. Based on this range it is reasonable to conclude that a petroleum tank in Iowa would experience diminution; that the diminution rate chosen by the general assembly is substantially less than the normal industry average for diminution as defined; and that the diminution rate of one tenth of one percent is below the range of actual diminution likely to be experienced by any owner or operator. The general assembly finds that a reasonable and conservative estimate of the diminution rate is one-tenth of one percent, and one-tenth of one percent shall be the diminution rate used for purposes of the environmental protection charge.

A particular owner or operator may be able to demonstrate that that owner or operator has not experienced this presumed rate of diminution over a specific time period, but that should not be a defense to payment of the environmental protection charge. The diminution rate is an average over time. There can be no proof that the same owner or operator may not experience a catastrophic release in the future and thus experience greater than average diminution.

The environmental protection charge is based on the statewide average diminution and in deference to the range of debate the actual diminution rate selected is well below the actual statewide average determined by the legislative fiscal bureau. Average diminution is used to provide a fair, pro rata distribution of the fee when it is impossible and impractical to determine every person's liability on an individual basis.

All who pay the environmental protection charge benefit directly or indirectly from the imposition of the charge and the extension of the benefits from the fund, made possible by the charge. A source of recovery for releases benefits the individual and the industry, not least because the federal government mandates proof of financial responsibility. Each member of the regulated tank community benefits by assistance to the entire petroleum distribution network. If each were to pay for only that individual's releases or reported "diminution" it would be impossible to comply with federal financial responsibility requirements, and *the social benefits of risk spreading and sharing the social costs would be precluded as well.*

The distribution of the costs of remedial action through the pro rata environmental protection charge is determined to be the most reasonable, fair, and equitable way of providing assistance to the regulated tank community to comply with federal financial responsibility regulations for both practical administrative considerations and policy reasons.

4. Private market insurance is currently not generally available for environmental hazards like petroleum releases, due to a lack of actuarial experience and uncertainty as to the extent of liability.

5. Tank owners and operators must often make capital improvements as a precondition to obtaining insurance, even when insurance is available.

tect the public health from leaking petroleum underground storage tanks.[16]

It is mere sophistry to suggest, as does Amoco, that merely because the Board administers an insurance type program that it no longer is serving a governmental function in its actions. Entities far more commercial in nature have been deemed to be performing governmental functions. *See generally South Dakota State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.*, 778 F.Supp. 1515, 1518 (D.S.D.1991) (holding that state cement plant was arm of the state for diversity purposes and that its function was a governmental purpose). Here, even the al-

leged proprietary function of the Board, the creation of an insurance type fund, has as one of its purposes the safeguarding of the public's wellbeing by providing owners of petroleum underground storage tanks with a means for quickly remediating grounds contaminated by petroleum leaks. Absent such a fund, petroleum leaks from underground storage facilities might be permitted to damage groundwater sources before an owner could raise the funds necessary to undertake appropriate remedial actions. Thus, the benefits of the Board inure to the the public. *See Martin Sales & Processing v. West Virginia Dep't of Energy*, 815 F.Supp. 940, 943

---

6. Because federal regulations will require tanks to be insured, or otherwise demonstrate financial responsibility, for amounts ranging from five hundred thousand dollars to one million dollars per occurrence on or before October 26, 1990, it is necessary to provide an interim means of providing insurance or a showing of financial responsibility and to encourage the development of private market sources of insurance or other private financial guarantees.

7. The creation of a state assistance account initially capitalized by revenue bond issues will make available the necessary capital to finance remedial actions, to improve storage tanks to required standards, and to provide insurance on an interim basis until a competitive private insurance market develops. The use of bonds to spread the high initial cost of conversion to federal standards will maximize Iowa's receipt of federal matching funds, reduce the impact upon service and preserve the availability of petroleum products in rural Iowa by offering financing to owners and operators of tanks, including local gas stations and factories, at favorable interest rates with reduced administrative costs.

8. The storage of petroleum in underground storage tanks poses a hazard to public health and welfare by endangering soil and groundwater with petroleum contamination. Groundwater containing one part of petroleum per one million parts of water exceeds safe drinking water standards. Petroleum experiences diminution by its nature, by the methods of transportation, by storage, and by human error and mechanical failure. The means and funding mechanism to take prompt corrective action upon discovery of a petroleum release are necessary to protect the public health and welfare. To protect and restore the state's vital groundwater, *it is necessary and essential that the state use all practical means to control or eliminate pollution hazards posed by petroleum underground storage tanks.*

9. *The public health and safety of the state will benefit from providing new methods to finance the capital outlays required to repair, upgrade, and replace petroleum underground storage tanks by small business owners of such tanks.*

10. All of the purposes stated in this section are public purposes and uses for which public moneys may be borrowed, expended, advanced, loaned, or granted.

1989 Iowa Acts Ch. 131, § 1 (emphasis added).

16. The legislative intent in passing the Act is revealed in its legislative history:

Sec. 2. Legislative intent. It is the intent of this Act to assist owners and operators, and especially small businesses, to comply with the minimum federal technical and financial responsibility standards and to protect and improve the quality of Iowa's environment by correcting existing petroleum underground storage tank releases and by prevention and early detection of future releases to minimize damages and costs to society.

Implementation and interpretation of this Act shall recognize the following additional goals: to provide adequate and reliable financial assurance for the costs of corrective action for preexisting petroleum underground storage tank releases; to create a financial responsibility assurance mechanism that provides certainty, sufficiency, and availability of funds to cover the costs of corrective action and third-party liability for prospective releases.

The fund created in this Act is intended as an interim measure to address the short-term unavailability of financial responsibility assurance mechanisms in the private market. This Act shall be administered to promote the expansion of existing assurance mechanisms and the creation of new ones, so that the insurance account may be phased out and discontinued when market mechanisms are generally available.

To minimize societal costs and environmental damage, speed is of the essence in responding to a release and taking corrective action.

1989 Iowa Acts Ch. 131, § 2.

(S.D.W.Va.1993) (holding that departments' promotion and enforcement of environmental interests through their programs inured benefit on the public).

Therefore, the court concludes that this factor also weighs in favor of a finding that the Board is an arm of the State of Iowa for the purposes of diversity jurisdiction.

### 4. Whether an Entity has been Separately Incorporated

The Board is not an incorporated entity. As the First Circuit instructed in its *University of Rhode Island* decision, "most unincorporated state agencies and departments are readily recognized as mere 'arms' or 'alter egos' of the State." *University of Rhode Island,* 2 F.3d at 1204. This factor does not support a finding of Board independence from the State.

### 5. Whether Entity's Property is Immune From State Taxation

Iowa Code Chapter 455G does not disclose whether property of the Fund is immune from Iowa State taxation. Therefore, this *Sherman* factor is inapplicable.

### 6. Local Law and Decisions

The only decision concerning Iowa Code Chapter 455G is the Iowa Supreme Court's recent decision in *Hagen,* 526 N.W.2d 531. Outside of setting forth the statutory framework for operation of the Fund, the *Hagen* decision provides little insight into the status and nature of the Board, for those specific questions were not before the Iowa Supreme Court. Therefore, this factor provides little guidance in determining the nature of the Board.

### 7. Immunity

Another factor under *Sherman* which must be considered is whether the sovereign has immunized itself from responsibility for the entity's actions. *Sherman,* 16 F.3d at 865 n.

6; *Kovats,* 822 F.2d at 1307. Here, Iowa Code section 455G.3(4) clearly limits the State of Iowa's liability for the Fund.[17] Thus, this factor weighs in favor of a finding of independence.

### 8. Fiscal Autonomy

The final two factors enumerated in *Sherman,* both relate to the funding of the entity and whether a judgment against the entity will have to be paid out of the state treasury. Because the Board is the Plaintiff in this action, and the *Sherman* factors were developed in the context of Eleventh Amendment immunity, these two factors may be synthesized down to the question of the Board's fiscal autonomy. *See generally University of Rhode Island,* 2 F.3d at 1210. Before delving into the question of the Board's fiscal autonomy, the court wishes to note that although the *Sherman* factors are not weighted, courts have indicated that the question of financial autonomy is to be given primacy in the equation. *See Sherman,* 16 F.3d at 863; *Greenwood,* 778 F.2d at 453; *University of Rhode Island,* 2 F.3d at 1210 n. 13; *Kashani,* 813 F.2d at 845; *Hall,* 742 F.2d at 304; *Laje v. R.E. Thomason Gen. Hosp.,* 665 F.2d 724, 727 (5th Cir.1982); *Van Pilsum,* 863 F.Supp. at 936.

Revenue sources for the Fund are set out in Iowa Code § 455G.8:

> Revenue for the fund shall include, but is not limited to, the following, which shall be deposited with the board or its designee as provided by any bond or security documents and credited to the fund:

> 1. Bonds issued to capitalize fund. The proceeds of bonds issued to capitalize and pay the costs of the fund, and investment earnings on the proceeds except as required for the capital reserve funds.

---

17. Iowa Code § 455G.3(4) states:
4. The state, the general fund of the state, or any other fund of the state, other than the Iowa comprehensive petroleum underground storage tank fund, is not liable for a claim or cause of action in connection with a tank not owned or operated by the state, or agency of the state. All expenses incurred by the fund shall be payable solely from the fund and no liability or obligation shall be imposed upon the state. The liability of the fund is limited to

the extent of coverage provided by the account under which a claim is submitted, subject to the terms and conditions of that coverage. The liability of the fund is further limited by the moneys made available to the fund, and no remedy shall be ordered which would require the fund to exceed its then current funding limitations to satisfy an award or which would restrict the availability of moneys for higher priority sites. *The state is not liable for a claim presented against the fund.* (emphasis applied.)

2. Use tax. The revenues derived from the use tax imposed under chapter 423. The proceeds of the use tax shall be allocated, consistent with this chapter, among the fund's accounts, for debt service and other fund expenses, according to the fund budget, resolution, trust agreement, or other instrument prepared or entered into by the board or authority under direction of the board.

3. Storage tank management fee. That portion of the storage tank management fee proceeds which are deposited into the fund, pursuant to section 455B.479.

4. Insurance premiums. Insurance premium income as provided by section 455G.11 shall be credited to the insurance account.

5. Cost recovery enforcement. Cost recovery enforcement net proceeds as provided by section 455G.13 shall be allocated among the fund's accounts as directed by the board. When federal cleanup funds are recovered, the funds are to be deposited to the remedial account of the fund and used solely for the purpose of future cleanup activities.

6. Other sources. Interest attributable to investment of money in the fund or an account of the fund. Moneys in the form of a devise, gift, bequest, donation, federal or other grant, reimbursement, repayment, judgment, transfer, payment, or appropriation from any source intended to be used for the purposes of the fund.

Clearly, the Iowa legislature intended the funding for the Fund and the Board to be self-contained. Thus, the funding aspects for the Board are distinguishable from those found in the university cases in which the entity receives funds from both the state and from other sources. *See generally University of Rhode Island,* 2 F.3d at 1210–11; *Van Pilsum,* 863 F.Supp. at 937. Although this aspect of the Board's funding indicates the Board's autonomy, the Board's control over the Fund's moneys indicates otherwise. As the court noted above, the Iowa State Treasurer, not the Board, acts as custodian of the Fund and is responsible for disbursements of moneys. Iowa Code § 455G.3(1). *Cf. University of Tennessee v. United States Fideli-*

ty & Guar. Co., 670 F.Supp. 1379, 1387 (E.D.Tenn.1987) (noting that certain facets of university's financial operations were subject to statutory provisions). While the Fund is not in the Iowa State general treasury, it is nonetheless maintained as part of the State of Iowa's treasury. Thus, under the statutory framework establishing the Board, the Board is not given complete autonomy over the Fund's money. Furthermore, the Board's authority to expend money in the Fund is statutorily limited to those actions permitted in Iowa Code § 455G.6. These facts thus weigh against a finding of autonomy. *Cf. Lewis,* 837 F.2d at 199 (noting that local funds had to be held by state treasury or were restricted as to use evidenced lack of autonomy). The limitations on the Board's control over the Fund make this case distinguishable from the First Circuit's decision in *University of Rhode Island,* in which the court noted that the university enjoyed "plenary control" over nonappropriated funds, and had the power to fix and collect tuitions and fees. *University of Rhode Island,* 2 F.3d at 1206 n. 9. The powers delegated to the Board here are far more restrictive. Most significantly, the Board's power to raise moneys for the fund is statutorily limited. Unlike an independent corporate entity, which has the authority to both raise and disburse funds as needed, the Board's power to take either action is constricted by statutory limitations.

Overall, the court concludes that this final factor does not indicate independence from the State of Iowa because the Board's ability to raise revenues through bonds, taxes and other approved methods is limited, the Board's ability to direct expenditures of funds is also statutorily restricted, and the fact that the Fund's moneys are kept in the possession of the Iowa State Treasurer.

In summary, the majority of the *Sherman* factors weigh in favor of a determination that the Board is an arm or alter ego of the State of Iowa. First, while the Board does have certain powers to sue and contract, the limitations placed on these powers results in this factor not indicating independence. Second, the Board's lack of autonomy over its operations indicates that it is not independent of

the state. Third, because the court concludes that the Board is performing a governmental function, rather than a proprietary function, this factor comes down on the side of a finding that the Board is an arm of the State of Iowa for the purposes of diversity jurisdiction. Fourth, the fact that the Board is not separately incorporated indicates a lack of independence from the state. Finally, restrictions placed on the fiscal actions of the Board indicate that it is an arm of the state. Against these factors only one factor, the fact that the State of Iowa has immunized itself from responsibility for the Board's actions, weighs in favor of a finding of independence.[18]

### D. Conclusion

Amoco, as the party removing this case to federal court and opposing the Board's remand efforts, has the burden of establishing this court's subject matter jurisdiction. It is undisputed that the State of Iowa cannot be a "citizen" of itself; thus, if the Board is the alter ego of the State of Iowa, there is undeniably no diversity of citizenship jurisdiction here under 28 U.S.C. § 1332.

In resolving this diversity of citizenship jurisdictional question, the court must first establish the appropriate test to apply. While the federal courts have undertaken several related approaches—this court adopts the multifactor analysis borne out of the Eleventh Amendment immunity context. This appears to be the majority view. While our circuit has not spoken directly on this question, it has adopted the nine factor approach articulated in the Third Circuit for evaluating whether an entity is entitled to Eleventh Amendment immunity. Other federal courts, which this court finds persuasive, have applied the Eleventh Amendment immunity analysis to the question of an entity's citizenship for diversity purposes. Applying the nine factor test here, the court concludes that the Board is the alter ego of the State of Iowa. Regardless of which test is utilized, the court concludes that the core judicial inquiry—whether or not the Board is independent of the State of Iowa—leads to the

conclusion that the Board is the alter ego of the State of Iowa. Thus, the court concludes that this court lacks subject matter diversity of citizenship jurisdiction under 28 U.S.C. § 1332. The Board's motion to remand to state court is granted because Amoco has failed in its burden of establishing subject matter jurisdiction in this court.

**IT IS SO ORDERED.**

---

**18.** Two factors, whether the Board's property is immune from state taxation and local laws and decisions, do not provide guidance on the question of the board's status.